IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

CHRISTOPHER A. DAVIDSON,

        Plaintiff,                          No. 3:10-cv-6284-HZ

       v.

MICHAEL J. ASTRUE, Commissioner        OPINION & ORDER
of Social Security,

        Defendant.

Kathryn Tassinari
Robert A. Baron
HARDER, WELLS, BARON & MANNING, P.C.
474 Willamette, Suite 200
Eugene, Oregon 97401

       Attorneys for Plaintiff

Dwight C. Holton
UNITED STATES ATTORNEY
District of Oregon

/ / /

1 - OPINION & ORDER

Adrian L. Brown
ASSISTANT UNITED STATES ATTORNEY
1000 S.W. Third Avenue, Suite 600
Portland, Oregon 97204-2902

David J. Burdett
SPECIAL ASSISTANT UNITED STATES ATTORNEY
Office of the General Counsel
Social Security Administration
701 Fifth Avenue, Suite 2900 M/S/ 221A
Seattle, Washington 98104-7075

    Attorneys for Defendant

HERNANDEZ, District Judge:

Plaintiff Christopher Davidson brings this action seeking judicial review of the Commissioner's final decision to deny disability insurance benefits (DIB) and supplemental security income (SSI). This Court has jurisdiction pursuant to 42 U.S.C. § 405(g) (incorporated by 42 U.S.C. § 1382(c)(3)). I reverse the Commissioner's decision.

## PROCEDURAL BACKGROUND

Plaintiff applied for DIB and SSI on December 4, 2007, alleging an onset date of October 23, 2007. Tr. 120-30. His applications were denied initially and on reconsideration. Tr. 58-66, 72-76.

On August 27, 2009, plaintiff appeared, with counsel, for a hearing before an Administrative Law Judge (ALJ). Tr. 19-53. On September 23, 2009, the ALJ found plaintiff not disabled. Tr. 9-18. The Appeals Council denied review. Tr. 1-5.

## FACTUAL BACKGROUND

Plaintiff alleges disability based on intestinal problems, back and joint problems, and "side pain." Tr. 149, 160. At the time of the hearing, he was twenty-six years old. Tr. 22. He

has a General Equivalence Diploma (GED), and has past relevant work experience as a grocery bagger, as well as at a blood bank which the vocational expert (VE) categorized as telemarketing work. Tr. 45. He also has training as an automobile technician and worked as an automobile mechanic, but the VE did not consider that job to be "past relevant work" because plaintiff did not perform it long enough and he would not have met the specific vocational preparation (SVP) score. Id. Because the parties are familiar with the medical and other evidence of record, I refer to any additional relevant facts necessary to my decision in the discussion section below.

## SEQUENTIAL DISABILITY EVALUATION

A claimant is disabled if unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. § 423(d)(1)(A).

Disability claims are evaluated according to a five-step procedure. See Valentine v. Comm'r, 574 F.3d 685, 689 (9th Cir. 2009) (in social security cases, agency uses five-step procedure to determine disability). The claimant bears the ultimate burden of proving disability. Id.

In the first step, the Commissioner determines whether a claimant is engaged in "substantial gainful activity." If so, the claimant is not disabled. Bowen v. Yuckert, 482 U.S. 137, 140 (1987); 20 C.F.R. §§ 404.1520(b), 416.920(b). In step two, the Commissioner determines whether the claimant has a "medically severe impairment or combination of impairments." Yuckert, 482 U.S. at 140-41; 20 C.F.R. §§ 404.1520(c), 416.920(c). If not, the claimant is not disabled.

In step three, the Commissioner determines whether the impairment meets or equals "one

<30000000000000000000000000000000000000000000000000000000000000000000000000000000000000000000000000>

of a number of listed impairments that the [Commissioner] acknowledges are so severe as to preclude substantial gainful activity." Yuckert, 482 U.S. at 141; 20 C.F.R. §§ 404.1520(d), 416.920(d).  If so, the claimant is conclusively presumed disabled; if not, the Commissioner proceeds to step four.  Yuckert, 482 U.S. at 141.

In step four, the Commissioner determines whether the claimant, despite any impairment(s), has the residual functional capacity (RFC) to perform "past relevant work."  20 C.F.R. §§ 404.1520(e), 416.920(e).  If the claimant can, the claimant is not disabled.  If the claimant cannot perform past relevant work, the burden shifts to the Commissioner.  In step five, the Commissioner must establish that the claimant can perform other work.  Yuckert, 482 U.S. at 141-42; 20 C.F.R. §§ 404.1520(e) & (f), 416.920(e) & (f).  If the Commissioner meets his burden and proves that the claimant is able to perform other work which exists in the national economy, the claimant is not disabled.  20 C.F.R. §§ 404.1566, 416.966.

## THE ALJ'S DECISION

At step one, the ALJ determined that plaintiff had not engaged in substantial gainful activity since his alleged onset date through his date of last insured.  Tr. 14-15.  Next, at step two, the ALJ determined that plaintiff had the following impairments: mesenteric adenitis, ulcerative proctosigmoiditis, and ankylosing spondylitis.  Tr. 15.  But, the ALJ further determined that plaintiff did not have an impairment or combination of impairments that significantly limited, or could be expected to significantly limit, his ability to perform basic work-related activities for twelve consecutive months.  Id.  Therefore, the ALJ determined that plaintiff had no severe impairments or combination of impairments and he concluded his analysis at step two.  Id.

/ / /

STANDARD OF REVIEW

A court may set aside the Commissioner's denial of benefits only when the Commissioner's findings are based on legal error or are not supported by substantial evidence in the record as a whole. Vasquez v. Astrue, 572 F.3d 586, 591 (9th Cir. 2009). "Substantial evidence means more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Id. (internal quotation omitted). The court considers the record as a whole, including both the evidence that supports and detracts from the Commissioner's decision. Id.; Lingenfelter v. Astrue, 504 F.3d 1028, 1035 (9th Cir. 2007). "Where the evidence is susceptible to more than one rational interpretation, the ALJ's decision must be affirmed." Vasquez, 572 F.3d at 591 (internal quotation and brackets omitted); see also Massachi v. Astrue, 486 F.3d 1149, 1152 (9th Cir. 2007) ("Where the evidence as a whole can support either a grant or a denial, [the court] may not substitute [its] judgment for the ALJ's") (internal quotation omitted).

DISCUSSION

Plaintiff alleges that the ALJ erred by (1) rejecting the opinion of plaintiff's treating physician; (2) rejecting plaintiff's testimony; (3) giving weight to the non-examining Disability Determination Services physicians; and (4) finding that plaintiff's impairments were not severe.

I. Treating Physician Opinion

As the ALJ found, plaintiff has three impairments. Plaintiff was diagnosed with ulcerative proctosigmoiditis in August 2007 by Dr. David Glaser, M.D. Tr. 201-02. Plaintiff's medical records sometimes refer to this impairment as ulcerative colitis. E.g., Tr 226, 250. As explained in the Merck Manual, ulcerative colitis "is a chronic inflammatory and ulcerative

5 - OPINION & ORDER

disease arising in the colonic mucosa, characterized most often by bloody diarrhea." The Merck Manual of Diagnosis & Therapy 172 (Robert S. Porter & Justin L. Kaplan eds., 19th ed. 2011). If it is localized to the rectum, it is referred to as ulcerative proctitis. Id. For plaintiff, the condition is present in his rectum and sigmoid colon, the part of the colon between the descending colon and the rectum. Tabers Cyclopedic Med. Dict. 2125 (21st ed. 2005); see also Id. at 1898 (defining proctosigmoiditis as "[i]nflammation of the rectum and sigmoid.").

Between the time of his diagnosis and his hearing before the ALJ approximately two years later, plaintiff treated this impairment with various medications, beginning with Colazal[1] and Canasa suppositories[2]. Tr. 199, 201, 227. His symptoms subsided somewhat, Tr. 229, but in November 2007, he started to have rectal bleeding and more diarrhea even while taking the Colazal. Tr. 227. Dr. Glaser started plaintiff on prednisone[3], initially with a dose of twenty milligrams, three times per day, but with the intention of tapering it down quickly. Tr. 226-27. Plaintiff's symptoms improved and he went to twenty milligrams, twice per day after one week. Tr. 226. By mid-December 2007, he was taking ten to fifteen milligrams per day. Tr. 190, 225. However, on December 12, 2007, Dr. Glaser increased the dose to twenty milligrams, once per

---

[1] The generic name of this drug is balsalazide. http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0001060/. It is an anti-inflammatory drug "used to treat ulcerative colitis, a condition in which the bowel is inflamed. . . . It is converted in the body to mesalamine and works by reducing bowel inflammation, diarrhea, rectal bleeding, and stomach pain." Id.

[2] The generic name of this drug is mesalamine. http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000880/. It is an anti-inflammatory drug and the suppository form is used to treat inflammation of the lower part of the colon. Id.

[3] Prednisone is a corticosteroid used to treat a variety of conditions, including certain conditions of the intestines. http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000091/.

day. Tr. 225. Plaintiff continued to take the other medications as well. Id.

In November 2008, plaintiff consulted with and received treatment from gastroenterologist Dr. Peter Adesman for the colitis condition. Tr. 250-51. Dr. Adesman noted that plaintiff was taking five milligrams per day of prednisone, that predisone therapy had helped with his symptoms, but that plaintiff did not experience significant improvement with Colazal and Canasa suppositories. Tr. 250. Dr. Adesman believed that plaintiff would benefit from the combination of Cortifoam[4] and "the 5-ASA product"[5] to keep the disease in remission. Id. He gave plaintiff Lialda[6] samples, and a prescription card for $25 for a one-month supply. Id.

In December 2008, Dr. Adesman reported that plaintiff experienced increased abdominal pain and diarrhea when taking Lialda. Tr. 249. He was having intermittent rectal bleeding and inconsistent bowel movements, with eight to ten on some days and none on other days. Id. Dr. Adesman noted that because of financial reasons, plaintiff was unable to fill the prescription for Cortifoam, which Dr. Adesman believed would be helpful to plaintiff. Id. Dr. Adesman gave plaintiff samples of Colocort enemas.[7] Id. Dr. Adesman also remarked that he recommended that plaintiff find "employment where health insurance is available." Id. He thought it unlikely

---

[4] Cortifoam is hydrocortisone in foam form. http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000774/

[5] "5-Aminosalicylic acid (5-ASA)" refers to mesalamine and is commonly used to treat mild to moderately active ulcerative colitis. http://www.drugs.com/ppa/mesalamine-5-aminosalicylic-acid-5-asa.html; http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0012549/

[6] Lialda is another brand name for mesalamine. http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000880/

[7] Colocort is a brand name for hydrocortisone. http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000774/

that plaintiff would receive disability from his proctitis or ankylosing spondylitis conditions. Id.

Plaintiff last saw Dr. Adesman in April 2009. Tr. 248. Dr. Adesman noted that plaintiff's condition improved with Colocort enemas given to him previously by Dr. Adesman, but that plaintiff could not afford the medication. Tr. 248. Dr. Adesman gave plaintiff samples of mesalamine enemas. Id.

In December 2007, plaintiff was diagnosed with mesenteric adenitis when a CT scan of his abdomen and pelvis, performed after he complained of left flank pain, showed the presence of inflamed mesenteric lymph nodes. Tr. 190-91, 193, 215. "Mesenteric" refers to the mesentery, which is "the peritoneal fold that encircles the small intestine and connects it to the posterior abdominal wall." Tabers at 1449. "Adenitis" refers to inflammation of lymph nodes or a gland. Id. at 46. The condition was "likely related" to plaintiff's proctosigmoiditis. Tr. 191.

As to the third impairment, plaintiff was diagnosed with ankylosing spondylitis by rheumatologist Dr. David Dryland on November 4, 2008. Tr. 259-61. Ankylosing spondylitis is a "chronic progressive inflammatory disorder" which "involves primarily the joints between articular processes, costovertebral joints, and sacroiliac joins, and occasionally the iris or the heart valves." Tabers at 2182. Dr. Dryland noted plaintiff's history of life-long autoimmune disease symptoms, including colitis, eczema, hives, hip pain, low back pain, and iritis. Tr. 259. X-rays confirmed that plaintiff had abnormal sacroiliac joints with fusion at the upper bilateral joint space and sclerosis, and narrowing on the right lower joint. Tr. 264. The left lateral joint space was also irregular and sclerotic. Id.

Dr. Dryland started plaintiff on methotrexate[8]. Tr. 261. Dr. Dryland noted that plaintiff would likely need Remicade or Humira[9] in the future. Id.

Dr. Dryland saw plaintiff again on January 13, 2009. Tr. 256-58. Plaintiff told Dr. Dryland that he had taken the methotrexate for four weeks, then stopped taking it because of a cold, and had failed to restart it. Tr. 256. He complained of low back pain continuing into the left buttock, pain and stiffness with increasing stiffness as the day wore on, and fatigue. Id. Plaintiff was instructed to restart the methotrexate. Tr. 258. Dr. Dryland also discussed Remicade infusions, which he explained were two-hour infusions, given at weeks 0, 2, 6, and then approximately every 8 weeks. Id. At the time, plaintiff was taking five milligrams of prednisone, as well as a pain reliever as needed at bedtime. Tr. 256.

In February 2009, Dr. Dryland had x-rays of plaintiff's hands, feet, and spine taken. Tr. 262. He noted some degenerative changes in plaintiff's hands which he thought could be seronegative disease, rheumatoid arthritis, or a combination of inflammatory arthritis and osteoarthritis. Tr. 262. He also noted some mild degenerative changes in plaintiff's feet and some mild to moderate degenerative changes in plaintiff's cervical spine. Id. A chest x-ray was also ordered as part of a "pre-Remicade therapy." Tr. 263. It was normal. Id.

On March 30, 2009, Dr. Dryland noted that plaintiff was taking fifteen milligrams of

---

[8] Methotrexate is used to treat a variety of conditions, including severe rheumatoid arthritis and other conditions that develop when the immune system is over-active, by decreasing the activity of the immune system. http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000547/.

[9] The generic name of Remicade is infliximab. http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000267/. The generic form of Humira is Adalimumab. http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000219/. Both drugs are infusions used to treat a variety of auto-immune disorders including ulcerative colitis and ankylosing spondylitis. Id.

9 - OPINION & ORDER

methotrexate and had two infusions of Remicade. Tr. 253. Plaintiff was feeling better on the Remicade, both as to his ulcerative colitis and his ankylosing spondylitis. Id. Although he still had some symptoms, they had improved. Id. Plaintiff was continued on methotrexate and the Remicade infusions. Tr. 255.

On August 15, 2009, Dr. Dryland completed a questionnaire provided by plaintiff's counsel regarding plaintiff's limitations. Tr. 270-71. Plaintiff's diagnoses were listed as ankylosing spondylitis and ulcerative colitis. Tr. 270. Dr. Dryland indicated that plaintiff's condition had lasted, or could be expected to last, at least twelve months. Id. He stated that the diseases were lifelong, but treatable. Id. He listed plaintiff's symptoms as joint pain, stiffness, decreased range of motion, blurry and painful vision, diarrhea, abdominal pain, and weight loss. Id. He answered "yes," to the question of whether plaintiff had to lie down during the day, and explained that plaintiff needed a break for fifteen to sixty minutes every one to two hours, depending on activity. Tr. 271. He also noted that the side effects of plaintiff's medications were fatigue, nausea, and an increased risk of infection. Id. He opined that more than two days per month, plaintiff would be unable to maintain a regular work schedule. Id.

At the hearing, plaintiff testified that he was taking Remicade and methotrexate. Tr. 22. Although he had been prescribed Cortifoam by Dr. Adesman, he could not afford to purchase it. Tr. 23. Plaintiff has no medical insurance. Tr. 28. Plaintiff was able to pay for the methotrexate himself as a result of part-time employment, but he relied on a manufacturer donation program for Remicade. Tr. 28. The cost of that drug is approximately $350 per vial. Id. Plaintiff uses about four vials every six weeks. Id. Providence Health Systems donates the $1,000 cost of the actual infusion procedure. Tr. 29.

10 - OPINION & ORDER

> In his opinion, the ALJ discussed Dr. Dryland's August 15, 2009 opinion and stated:
>
> Dr. David Dryland - whose notes are not in the record - opined on August 15, 2009 that due to ankylosing spondylitis and ulcerative colitis, "lifelong, but treatable" conditions, the claimant would need breaks for 15-60 minutes every 1-2 hours, depending on activity, and would be absent from work more than 2 times per month. . . . If true, this would preclude competitive employment but, based on the totality of the evidence, it is not. Also the undersigned takes notice that this physician's notes and/or examinations are conspicuously absent from the medical record.
>
> As for the opinion evidence, the undersigned accords no weight to Dr. Dryland's opinion for the above-stated reasons.

Tr. 17.

Social security law recognizes three types of physicians: (1) treating, (2) examining, and (3) nonexamining. Holohan v. Massanari, 246 F.3d 1195, 1201-02 (9th Cir. 2001); Lester v. Chater, 81 F.3d 821, 830 (9th Cir. 1996). Generally, more weight is given to the opinion of a treating physician than to the opinion of those who do not actually treat the claimant. Id.; 20 C.F.R. §§ 1527(d)(1)-(2), 416.927(d)(1)-(2).

If the treating physician's medical opinion is supported by medically acceptable diagnostic techniques and is not inconsistent with other substantial evidence in the record, the treating physician's opinion is given controlling weight. Orn v. Astrue, 495 F.3d 625, 631 (9th Cir. 2007); Holohan, 246 F.3d at 1202. If a treating physician's opinion is not given "controlling weight" because it is not "well-supported" or because it is inconsistent with other substantial evidence in the record, the ALJ must still articulate the relevant weight to be given to the opinion under the factors provided for in 20 C.F.R. §§ 1527(d)(2), 416.927(d)(2). Orn, 495 F.3d at 631.

If the treating physician's opinion is not contradicted by another doctor, the ALJ may reject it only for "clear and convincing" reasons. Id. at 632. Even if the treating physician's

11 - OPINION & ORDER

opinion is contradicted by another doctor, the ALJ may not reject the treating physician's opinion without providing "specific and substantial reasons" which are supported by substantial evidence in the record.  Id.

Plaintiff argues that the ALJ erred in rejecting Dr. Dryland's opinion which, plaintiff contends, should be given controlling weight.  Defendant asserts that the ALJ offered specific and legitimate reasons for giving Dr. Dryland's opinion no weight.

I agree with plaintiff that Dr. Dryland's opinion is supported by "medically acceptable diagnostic techniques" and is not inconsistent with other substantial evidence in the record.  Dr. Dryland noted in his opinion that plaintiff's relevant clinical findings included synovitis, decreased range of motion, joint damage as shown on x-rays, and biopsies confirming the ulcerative colitis.  Tr. 270.  The opinions of the Disability Determination Services physicians that plaintiff was not disabled are not by themselves substantial evidence.  Lester, 81 F.3d at 831.  Moreover, in this case, those opinions were rendered in January and April 2008, Tr. 245, 246, before plaintiff was diagnosed with ankylosing spondylitis.  Thus, they are irrelevant to a determination of whether plaintiff's impairments at the time of the hearing were disabling.

Additionally, the ALJ gave weight to Dr. Adesman's "opinion."  Tr. 17-18.  The ALJ noted that Dr. Adesman "did not believe that the claimant's conditions are disabling and [] repeatedly advised the claimant to get a job (with a medical insurance as an added benefit)[.]"  Id. But, the ALJ erred in construing Dr. Adesman's notes of plaintiff's December 10, 2008 office visit as containing an "opinion" capable of being considered "substantial evidence."  Dr. Adesman encouraged plaintiff to seek employment with health insurance because, as he noted more than once, plaintiff could not afford the medication that would be the most helpful in

12 - OPINION & ORDER

treating his ulcerative proctosigmoiditis. Tr. 249. Without more, this statement is not fairly understood as an opinion that plaintiff can maintain full-time competitive employment. Similarly, Dr. Adesman's opinion that it is "unlikely" that plaintiff would receive disability from his conditions is also, without more, not an opinion that plaintiff is not disabled within the meaning of the Social Security Act. There is no discussion of any specific limitations, or lack thereof, and no evidence that Dr. Adesman is familiar with the standards used in a social security disability adjudication. It was unreasonable for the ALJ to rely on Dr. Adesman's December 10, 2008 chart note as substantial evidence conflicting with Dr. Dryland's opinion.

Given the supporting "medically acceptable diagnostic techniques" and the lack of any inconsistent substantial evidence in the record, Dr. Dryland's opinion is entitled to controlling weight.

Alternatively, even if the opinion is not entitled to controlling weight, the ALJ was required to articulate "clear and convincing" or "specific and substantial" reasons to reject the opinion. As made clear in the preceding discussion, I do not consider Dr. Adesman's "opinion" to contradict Dr. Dryland's opinion of plaintiff's limitations. As a result, the ALJ had to articulate clear and convincing reasons to reject Dr. Dryland's opinion. However, even if Dr. Adesman's "opinion" is considered to be contradictory, the ALJ was still required to articulate specific and substantial reasons in support of his conclusion that Dr. Dryland's opinion was entitled to no weight.

The ALJ offered two reasons in support of rejecting Dr. Dryland's opinion: the lack of any of Dr. Dryland's notes or examinations in the record, and that the opinion was inconsistent with "the totality of evidence." As should be clear from the recitation of the evidence of record,

13 - OPINION & ORDER

Dr. Dryland's chart notes are in the record and the ALJ erred in finding that they were not.  Thus, this is neither a "clear and convincing" nor a "specific and substantial" reason to support the rejection of Dr. Dryland's opinion.

Stating that the treating physician's opinion is inconsistent with "the totality of the evidence" is also not a clear and convincing or specific and substantial reason to reject the opinion.  See Orn (ALJ must set out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings, in order to demonstrate specific and substantial reasons to reject a treating physician's opinion); Reddick v. Chater, 157 F.3d 715, 725 (9th Cir. 1998) (in rejecting treating physician's opinion, the "ALJ must do more than offer his conclusions. He must set forth his own interpretations and explain why they, rather than the doctors', are correct"); Cotton v. Bowen, 799 F.2d 1403, 1408 (9th Cir. 1986) (ALJ meets burden required to reject treating physician's opinion by "setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings"), superseded by statute on other grounds as stated in Bunnell v. Sullivan, 912 F.2d 1149 (9th Cir.1990).  Simply stating that the opinion is not consistent with the totality of the evidence is nothing more than offering an unsupported conclusion without discussion of or citation to the specific reasons and parts of the record that the ALJ found to be inconsistent.

As a result, the ALJ erred in rejecting Dr. Dryland's opinion.  Moreover, I agree with plaintiff that this improperly rejected opinion should be credited as true and the case remanded for benefits, making discussion of plaintiff's remaining arguments unnecessary.  The decision whether to remand for further proceedings or for immediate payment of benefits is within the discretion of the court.  Harman v. Apfel, 211 F.3d 1172, 1178 (9th Cir. 2000).  The issue turns

14 - OPINION & ORDER

on the utility of further proceedings. A remand for an award of benefits is appropriate when no useful purpose would be served by further administrative proceedings or when the record has been fully developed and the evidence is insufficient to support the Commissioner's decision. Rodriguez v. Bowen, 876 F.2d 759, 763 (9th Cir. 1989).

Under the "crediting as true" doctrine, evidence should be credited and an immediate award of benefits directed where "'(1) the ALJ has failed to provide legally sufficient reasons for rejecting such evidence, (2) there are no outstanding issues that must be resolved before a determination of disability can be made, and (3) it is clear from the record that the ALJ would be required to find the claimant disabled were such evidence credited.'" Harman, 211 F.3d at 1178 (quoting Smolen v. Chater, 80 F.3d 1273, 1292 (9th Cir. 1996)). The "crediting as true" doctrine is not a mandatory rule in the Ninth Circuit, but leaves the court flexibility in determining whether to enter an award of benefits upon reversing the Commissioner's decision. Connett v. Barnhart, 340 F.3d 871, 876 (9th Cir. 2003) (citing Dodrill v. Shalala, 12 F.3d 915, 919 (9th Cir. 1993)); Nguyen v. Chater, 100 F.3d 1462, 1466-67 (9th Cir. 1996); Bunnell v. Sullivan, 947 F.2d 341, 348 (9th Cir. 1991).

The ALJ failed to provide legally sufficient reasons to reject Dr. Dryland's opinion. Although the ALJ ended his analysis at step two, there are no outstanding issues that must be resolved because the record makes clear that the ALJ would be required to find the claimant disabled were the evidence credited. At the hearing, the VE testified that should plaintiff have to miss two or three days of work in a month on a regular basis, the plaintiff would not be eligible for competitive employment. Tr. 48. Dr. Dryland's August 15, 2009 assessment includes the limitation that plaintiff's impairments would cause him to be unable to maintain a regular work

15 - OPINION & ORDER

schedule more than two days per month. Tr. 271. The ALJ himself stated that the limitations noted by Dr. Dryland of plaintiff needing regular breaks and being absent from work more than two days per month, would preclude competitive employment. Tr. 17. Thus, when the improperly rejected opinion of Dr. Dryland is credited as true, the record supports a finding of disability.

## CONCLUSION

The Commissioner's decision is reversed and remanded for an award of benefits.

IT IS SO ORDERED.

Dated this  26th  day of  September , 2011


/s/ Marco A. Hernandez
Marco A. Hernandez
United States District Judge